**Judith ELDRED, Plaintiff,**

v.

**CONSOLIDATED FREIGHTWAYS
CORPORATION OF DELAWARE,
Defendant.**

**Civ. A. No. 93–30095–MAP.**

United States District Court,
D. Massachusetts.

Aug. 31, 1995.

Thomas J. Oppenheimer, Springfield, MA, for plaintiff.

Richard U. Stubbs, Jr., Skoler, Abbott, Hayes & Presser, Jay M. Presser, Rosemary J. Nevins, Skoler, Abbott & Presser, Springfield, MA, for defendant.

### *MEMORANDUM OF DECISION*
PONSOR, District Judge.

## I. *INTRODUCTION*

Plaintiff Judith Eldred brought this action against her former employer Consolidated Freightways Corporation of Delaware ("Consolidated") alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"). Specifically, plaintiff alleges that (1) she was denied a promotion,

was discharged, and was denied rehiring in retaliation for filing an Equal Pay Act claim against defendant (Count I); (2) that she was denied a promotion, was discharged and was denied rehiring on the basis of her gender (Count II), and (3) that she was denied a promotion, discharged and denied rehiring based on the combination of her gender and the filing of an equal pay claim (Count III).

Plaintiff has not demonstrated by a fair preponderance of the evidence that any of defendant's actions were taken against her in retaliation for her equal pay claim. Therefore, judgment will enter for defendant on Counts I and III. However, based on the extensive trial testimony, the exhibits submitted in evidence, and the written submissions following the trial, this court concludes that Judith Eldred was denied a promotion, terminated and denied rehire based on her gender. The court will therefore find for the plaintiff on Count II.

## II. *TITLE VII STANDARD*

Title VII provides a cause of action for both sex discrimination and retaliation.[1] *McDonnell Douglas* establishes the order of proof in both discrimination and retaliation cases in situations where direct evidence of discrimination is lacking. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ Plaintiff must first make out a *prima facie* case of discrimination or retaliation. *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824. The elements of the *prima facie* case differ depending on the circumstances and the nature of the alleged discriminatory conduct. A *prima facie* case of discriminatory refusal to promote, or discriminatory refusal to rehire requires the plaintiff to establish that: (1) plaintiff is within a class protected by Title VII; (2) she applied for and was qualified for the position sought; (3) despite her qualifications, she

was rejected, and (4) after her rejection, the position was filled or defendant continued its efforts to fill the position with someone with plaintiff's qualifications. *Petitti v. New England Tel. & Tel. Co.,* 909 F.2d 28, 32 (1st Cir.1990); *see Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 107 (1st Cir.1988), citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. *See also Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ Discriminatory termination in the context of a reduction-in-force requires the plaintiff to show: (1) she is a member of a protected class; (2) she met the employer's legitimate job-performance expectations; (3) she was discharged, and (4) the employer either did not treat members of the protected class neutrally or retained persons not within the protected class in the same position. *Udo v. Tomes,* 54 F.3d 9, 12 (1st Cir.1995); *Lawrence v. Northrop Corp.,* 980 F.2d 66, 69 (1st Cir.1992).

■ To establish a *prima facie* case of retaliation under Title VII, the plaintiff must show (1) that she engaged in a protected activity of which the employer was aware, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between her protected activity and the adverse employment action. *Hoeppner v. Crotched Mountain Rehabilitation Ctr., Inc.,* 31 F.3d 9, 14 (1st Cir.1994); *Ramos v. Roche Products, Inc.,* 936 F.2d 43, 48 (1st Cir.1991); *Petitti,* 909 F.2d at 33, citing *Watts v. University of Delaware,* 622 F.2d 47 (3rd Cir.1980).

■ By making out a *prima facie* case for discrimination and retaliation, the plaintiff, in effect, creates a presumption that the employer unlawfully discriminated against her. *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993), citing *Burdine,* 450 U.S. 248, 254,

---

1. Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any individual with respect to his compensation, terms conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(1). With respect to the retaliation claim, Title VII provides that "it shall be unlawful employment practice for an employer to discriminate against

any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). This presumption then imposes a burden of production on the defendant to articulate some legitimate, nondiscriminatory reason for the challenged action. *Id.; Lawrence v. Northrop Corp.*, 980 F.2d 66, 69 (1st Cir. 1992). However, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2747, quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

■■■ If defendant carries this burden of production, plaintiff has the burden of persuading the court that the reason or reasons proffered by the defendant are a pretext for discrimination or retaliation, as the case may be. *See Goldman v. First National Bank,* 985 F.2d 1113, 1117 (1st Cir.1993); *Morgan v. Massachusetts General Hospital,* 901 F.2d 186, 191 (1st Cir.1990); *see Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. The plaintiff must prove both that the employer's articulated reason for the adverse action is a pretext and that the true reason for the adverse employment actions is discrimination. *Udo v. Tomes,* 54 F.3d at 13, citing *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 16 (1st Cir.1994). The plaintiff may rely on the same evidence to prove both pretext and discrimination, but the evidence must be sufficient for the court to infer that the employer's decision was motivated by discriminatory animus. *Id.*

## III. *FINDINGS OF FACT*

### A. *BACKGROUND.*

1. Plaintiff, Judith Eldred, commenced employment with defendant, Consolidated, as a general clerk at its terminal in Pittsfield, Massachusetts in August of 1972. She was paid an hourly wage of $3.00.

2. Defendant was and is engaged in a nationwide trucking and transportation business. In the mid to late 1970's, the Pittsfield terminal generally employed five to six people: the plaintiff, a clerk on the day shift; John Bubriski, dispatcher/dock foreman on the night shift; William Sage, terminal manager, and two or three drivers.

3. After William Sage became terminal manager in 1973, plaintiff's responsibilities began to increase significantly. While Sage was on sales calls or out of the office, Eldred had sole responsibility for managing the terminal during the day. Despite the significant expansion of her duties, including the dispatching of drivers, which was generally considered the job of a salaried supervisor, plaintiff remained an hourly employee with the title "general office worker."

4. In 1974, John Bubriski commenced employment with Consolidated as a dispatcher/dock foreman, a salaried position. The duties of both Bubriski and Eldred were essentially identical.[2] Nevertheless, in 1978, plaintiff learned that Bubriski was making approximately $130.00 more per week. Plaintiff brought this to the attention of her terminal manager, William Sage, who stated he would talk to George Craig, the division manager. Sage never got back to her regarding this issue. Plaintiff then attempted to contact Craig herself, but had no success.

5. In December 1978, Eldred filed a pay discrimination claim with the Equal Employment Opportunity Commission, asserting that she was paid less for equal work than her male counterpart, John Bubriski.

6. Shortly after she filed her complaint, defendant raised Eldred's hourly rate. In addition, Consolidated demoted Bubriski to general clerk, changed his employee status from a salaried employee to an hourly rate employee, and reduced his income by approximately $100.00 per week. As a result, plaintiff and Bubriski had the same title and received approximately the same income.

7. Bubriski blamed Eldred for his demotion and pay cut. He felt that plaintiff should have handled her claim some other less adversarial way. Bubriski candidly admitted that he was hostile towards the plaintiff after she filed her formal claim. He did not know that Eldred had first attempted to resolve the matter informally by speaking

---

**2.** The only difference in their job responsibilities was that for some time Bubriski performed a "rating" function. However, this was eventually taken from him and centralized at corporate headquarters.

directly to Sage and Craig. Bubriski never challenged defendant's decision to demote him and cut his pay.

8. In 1981, Larue Deffley succeeded George Craig as division manager. Bubriski met with Deffley to express an interest in a supervisory position at a new facility in Chicopee, Massachusetts, which was scheduled to open in 1982. Deffley oversaw all Northeast terminals, including the one in Pittsfield and the new Chicopee terminal. The Chicopee terminal employed between 200 and 300 people.

9. Deffley then contacted Toby Asarese, the terminal manager at Chicopee, and recommended that he hire Bubriski for his supervisory staff. Although Asarese had considerable discretion in hiring his staff, Deffley's recommendation was essentially a directive to hire Bubriski. In 1982, Bubriski interviewed for and was promoted to dock foreman at the Chicopee terminal, regaining the title he had held before his demotion in Pittsfield. He became a salaried employee, beginning on or about June 1982, with a substantial increase in pay, from $8.97 per hour to $590.00 per week.

10. In the fall of 1981 Eldred also indicated to Deffley that she was interested in obtaining a supervisory position at the new terminal. Deffley was noncommittal.

11. In an effort to advance herself within the company, in August 1982, Eldred spoke to the Pittsfield terminal manager, Sage, and requested an opportunity to participate in the Program for Management Development class, Consolidated's management training program. Sage referred Eldred to Deffley, who advised her that because she was not a supervisory employee, she did not qualify for the program. However, the defendant's Administrative Manual makes no reference to this supposed limitation. Plaintiff then wrote to the director of training at corporate headquarters to inform him that, although she was not titled as a supervisor, she performed substantial supervisory functions. Nevertheless, Eldred was not invited to participate in the training program.

12. On September 24, 1982, Deffley offered Eldred the supervisory position of assistant linehaul supervisor (also called "assistant dispatcher") at the new facility in Chicopee. Plaintiff's promotion was effective October 24, 1982, at a salary of $560.00 per week.

13. Although Eldred was employed by Consolidated longer and received more favorable evaluations than Bubriski, she was promoted *after* Bubriski, to an inferior position and at a lower rate of pay.

14. When plaintiff began working at the Chicopee terminal, the personnel structure was as follows. Terminal manager, Toby Asarese, was assisted by Claude Marshall, assistant terminal manager. The terminal was then divided into three departments— Dock, Linehaul and Office. The Linehaul Department was headed by dispatch operations manager ("D.O.M.") John Beauchamp and an assistant dispatch operations manager ("A.D.O.M."). Next in the chain of command were four linehaul supervisors (or "dispatchers") followed by four assistant linehaul supervisors (or "assistant dispatchers"), of which plaintiff was one.

15. There was an equivalent hierarchy on the dock: a freight operations manager, an assistant freight operations manager, four dock foremen, John Bubriski being one, and four assistant dock foremen. The third section, the office, was run by William McCready, the office manager, and included several clerical staff.

16. Plaintiff was the only woman in any supervisory position throughout the Chicopee terminal when she commenced employment at Chicopee in October 1982.

17. Bubriski informed the dock supervisors about Eldred's prior equal pay claim and openly conveyed his resentment towards her. As a result, when Eldred came to Chicopee she was treated disrespectfully and ignored by some of the supervisors and managers on the dock where Bubriski worked.

18. On August 23, 1983, plaintiff's pay discrimination claim was resolved through a Consent Decree under which defendant paid $13,000 in back wages to the plaintiff. All of the defendant's management personnel who testified at trial admitted they had some

knowledge of her claim and/or the Consent Decree.

19. After August 1983, Asarese and Beauchamp exhibited a noticeably cool demeanor whenever interacting with Eldred. Furthermore, Eldred was no longer invited to office social functions that she was previously invited to.

B. *THE PROMOTION DENIAL*

20. Consolidated did not post available positions. Defendant did not have written guidelines or standards for making hiring or promotion decisions. There was no application process and the terminal manager had exclusive responsibility for the selection. It was customary to fill the positions of assistant supervisor and supervisor from within the company.

21. No objective criteria regarding the requirements for promotion were available to guide employees. It was a supervisor's duty to convey the standards for promotions to the employees orally. The only objective factors defendant stated it considered were whether the employee was keeping current with his or her work, whether the employee was cross-training, (that is, learning other jobs), and whether the employee came in on his or her days off. These factors were never reduced to writing. Overall, the process was undefined, arbitrary, and dependent upon the subjective evaluation of the terminal manager.

22. Asarese, Brady, Beauchamp and Kiernon all testified that an individual became promotable by extending himself or herself and by being "aggressive."

23. Word of mouth was the primary method used for recruiting if defendant went outside the company to fill a position.

24. Between January and May of 1985 plaintiff was denied a promotion from assistant linehaul supervisor to linehaul supervisor on three separate occasions.

25. The first linehaul supervisor position Eldred applied for became available in January 1985. Eldred expressed her interest in the position to Asarese upon hearing of the opening. As was the rule, the position was not posted and there was no formal procedure by which individuals could apply.

26. Asarese informed plaintiff that the position had already been filled by James Smith.

27. Although dispatch operations manager Beauchamp had recommended a female assistant dispatcher, Kim Matthews, for the position, Asarese selected a male, James Smith, for the job. Smith was given the job as a lateral transfer from the dock to dispatcher as an accommodation because he had been having back problems from working on the concrete dock platform. Although plaintiff had more experience in dispatching, Smith did have greater supervisory experience. The failure of defendant to promote plaintiff, instead of transferring Smith laterally, cannot be said by a preponderance of the evidence to have involved gender bias. It can be seen, however, as an instance of defendant's willingness to accommodate a male employee's physical problems. As will be seen, a similar generosity was not extended to defendant's rare female employees with analogous problems.

28. Smith returned to the dock in March 1985, and the linehaul supervisor position again became available. Again, Beauchamp recommended to Asarese that a woman, Matthews, be promoted. This time, Asarese followed Beauchamp's recommendation. Matthews had been with Consolidated only since January of 1983, when she was hired as a clerk. She had been in the assistant linehaul position since July of 1984. Matthews was praised as a hard-working and "aggressive" employee. At trial, defendant justified this characterization by pointing out that Matthews would yell, swear and throw objects at the drivers to get them to do their work. Although plaintiff had more seniority and experience, plaintiff obviously does not cite defendant's decision to promote Matthews as an instance of gender bias.

29. A third opening for linehaul supervisor arose in May 1985. At that time, Bubriski and Eldred were both assistants in linehaul.[3] For the third promotion, defendant

---

**3.** As noted earlier, Bubriski began in Chicopee in the position as dock foreman. The position was

chose Bubriski instead of Eldred. Defendant claims that Bubriski was promoted because he was an enthusiastic and "aggressive" employee, had worked previously as a supervisor in Dock, and had leadership experience as an officer in the Army Reserves.

30. Plaintiff was substantially more qualified for this promotion than Bubriski. While both were at the Pittsfield facility, plaintiff's evaluations were clearly superior.[4] Bubriski was frequently late to work and his evaluations were spotty. At Chicopee, plaintiff was in the assistant position for her entire tenure, approximately two and one-half years. Bubriski was in the position for less than one year. The only positive evaluation in evidence relative to Bubriski's performance in the assistant linehaul position postdates the promotion decision and appears to be an after-the-fact justification.

31. Plaintiff was evaluated twice as an assistant in linehaul prior to the promotion decision. In the first evaluation, in November 1982, shortly after she began in her position at Chicopee, Eldred was rated as "needs to improve." Defendant concedes that an employee in a new position is virtually always given the rating of "needs to improve" on their first evaluation. In February of 1983 she was recommended for a raise.

32. Her next evaluation was for the period from February 1983 to December 1983. For that period, plaintiff's supervisor, Beauchamp, stated that plaintiff "has performed her basic responsibilities very well," and rated her as "consistently meets" her job criteria. At this time she was recommended for another raise.

33. The plaintiff received a third evaluation dated January 1984 which once again rated her as consistently meeting the job criteria. Defendant did not know when this evaluation was filled out.

34. In this third evaluation, Beauchamp did state that Eldred "needs to extend herself if she intends to be promotable." However, this last evaluation is not consistent with the observations of the other supervisor in linehaul. Another of plaintiff's supervisors, Kiernon, testified that he did not have a problem with the way plaintiff interacted with the drivers, and admitted that she was able to keep current.[5] According to Kim Matthews, plaintiff did an excellent job staying current with her paperwork and showed enthusiasm by learning the nuts and bolts of parallel positions as well.

35. Matthews, who was promoted from the linehaul supervisor position to assistant dispatch operation manager in November 1986, testified unequivocally that plaintiff was more qualified for promotion than Bubriski. Matthews' testimony was particularly credible.

36. Beauchamp stated that he went with his "gut feeling" in his decision not to promote Eldred. His justification included many classical gender-linked stereotypes. He asserted that the plaintiff was not promoted because she lacked "aggressiveness" and was too "soft" with the drivers. Even if these characterizations were true—and this is highly dubious—they were never shown to have affected plaintiff's performance of her job. No delays and no problems with paperwork were ever attributed to plaintiff's supposed "softness." Moreover, none of these purported deficiencies was ever reduced to writing. In fact, as it turned out, Beauchamp's "gut feeling" was not reliable or accurate: Bubriski received negative ratings in each of his next three evaluations as linehaul supervisor. The unavoidable conclusion is not that plaintiff was passed over for the promotion because she was not aggressive; it was because she was not male.

---

too hard on his knees, and as a result he was transferred to an assistant dock foreman's position. He was then transferred to the Linehaul Department as an assistant linehaul supervisor.

**4.** There are two forms used by defendant to evaluate an employee's work performance. The first is the "Job Criterion" form, which allows the supervisor to rate the employee performance based on a four-tier rating system: frequently exceeds, consistently meets, needs to improve, and provisional. The second form entitled "Goal/Result," evaluates whether the employee accomplished the goals listed for his or her position.

**5.** Kiernon began his employment with Consolidated in 1982 as a linehaul supervisor, was promoted to assistant dispatch operations manager and then dispatch operations manager in 1986.

37. Having been denied the last promotion, plaintiff remained an assistant in linehaul.

38. Based on the evidence, the court finds that the plaintiff was more qualified than Bubriski for the linehaul supervisor promotion and that defendant's proffered reasons for its refusal to promote plaintiff were a pretext for gender-based discrimination.

## C. *THE TERMINATION*

39. Asarese claims that he received a directive from Deffley in July 1985 to cut three people from the terminal, one from each department. Deffley allegedly received this specific directive from his superior, Area Vice President Patrick Fleming, who was unavailable to testify.

40. It is not credible that Fleming would insist on cutting one person from each of the three departments rather than allowing the terminal manager, Asarese, to exercise his own discretion. Patrick Brady, Area Vice President at the time of the trial, testified that while the terminal might be told how many employees to lay off, it had never in his experience been told which departments to cut. This was more likely an after-the-fact justification presented to explain why plaintiff was discharged while clearly less qualified, more expendable males were retained in other departments.

41. In any event, the reductions were said to be for economic reasons and were to be effective immediately. Plaintiff was then terminated from the linehaul department, Frank Segars from Dock, and Donna Skinner from Office. Three male assistant linehaul supervisors retained their positions: Karl Schmidt, William Blight and Jack Haen. Plaintiff was more qualified than all three.

42. Asarese stated that he decided upon Eldred as the individual to be terminated from linehaul because she was, in his view, the "weakest link" in the department. He stated that in the three years as an assistant, she had not shown the initiative and intensity that would justify advancement beyond the assistant level. Asarese believed, again

based on remarks relayed to him by Beauchamp, that plaintiff was not "aggressive enough," "too soft," and "too friendly." Although defendant constantly referred to Eldred's lack of aggressiveness as the primary basis for the adverse actions, as mentioned above, nowhere was her lack of aggressiveness reflected in her employment record. Nor was there testimony that the drivers were delayed, their costs increased or the defendant lost money as a result of her work style. The reduction in force was simply a pretext, used to terminate plaintiff at the first available opportunity.

43. Plaintiff was certainly *not* the "weakest link" in the department. Eldred, in fact, was more qualified than the three men retained as assistants, as well as one of the male supervisors.

44. Jack Haen became an assistant in linehaul on March 31, 1985, and had only three months of experience as an assistant.[6] According to Asarese, he retained Haen because he had good potential, had been a road driver with a labor background and had extended himself by developing his own personal computer programs. Haen was retained even though he expressly communicated to Matthews that he was not interested in advancement in the company.

45. Karl Schmidt had been an assistant in linehaul only since April 28, 1985.[7] Schmidt was retained, according to Asarese, because his September to December 1984 evaluation rated him "very good" and because he was very "intense" and "aggressive." However, Schmidt's written evaluation in evidence contradicted Asarese's position. William Kiernon expressly stated on Schmidt's performance evaluation that "it is hoped that he will take a more aggressive position in 1986 with regards to the responsibilities of the Dispatcher." Defendant's justification for retaining Schmidt over plaintiff is not credible.

46. According to defendant, it retained William Blight because he was meticulous, showed he would take initiative, fought to

---

6. Haen replaced Kim Schmidt when she was promoted to supervisor.

7. Karl Schmidt replaced John Bubriski when Bubriski was promoted to supervisor.

stay current and showed signs of being stern when needed. Yet Matthews, who directly supervised him, credibly testified as to Blight's difficulties in dispatching. On a scale of 10, Matthews rated plaintiff an 8 and Blight a 3. John Beauchamp conceded at trial that Blight was sometimes off doing things that were not part of his job.[8]

47. Defendant also chose to retain Fred Skiba, a supervisor in linehaul who, in defendant's own words, was a mediocre performer. He was put on marginal status in 1984 and had "needs to improve" evaluations in both 1985 and 1986. The 1985 performance evaluation states that "Fred lacks the confidence and aggressiveness to be a good dispatcher."

48. As it happened, defendant's evaluative methods provided an ineffective and inadequate forecast of the individuals' performance abilities. Both Schmidt and Blight did not prove to be competent supervisors. Blight was rated "needs to improve" for three consecutive years (1986–1988) and was placed on marginal status in 1988. Schmidt was issued a reprimand for persistent tardiness, dated May 7, 1986.

49. Despite Eldred's good performance at Consolidated, the evidence is overwhelming that plaintiff's supervisors had been waiting for the chance to terminate her. The day Eldred was discharged she telephoned Area Vice President Fleming. Fleming told Eldred that the week *before* the lay-off decision was made her name had come across his desk as a person who was going to be terminated. Skiba, a former dispatcher, also told plaintiff that around the time plaintiff was promoted to Chicopee, Bubriski told him that Eldred was being promoted to Chicopee because it would be easier to terminate her at that facility than it would be in Pittsfield. Matthews testified that in January 1985 Kiernon, the assistant dispatch operations manager, stated that Eldred would not be around much longer and that when she was terminated she would not come back.

50. Based on the evidence, the plaintiff was more qualified than all three male assistants who were retained, as well as Frank Skiba. Defendant ignored Eldred's seniori-

ty, experience and performance and held her to a higher standard than other similarly situated male employees. In addition, defendant's critical remarks relating to plaintiff were unfounded, undeserved and did not reflect her employment record. The court finds that Consolidated's proffered reasons for Eldred's termination lack credibility and that plaintiff was terminated because she was a woman.

## D. *THE FAILURE TO REHIRE*

51. At the time of Eldred's termination, defendant told her that she would be considered for rehire, and so indicated on her termination form. Moreover, plaintiff conveyed her desire to be rehired to Deffley. However, Eldred was never considered for rehire. Defendant's stated reason for failing to rehire Eldred when openings became available was that she did not show herself to be "promotable." Defendant's justification for its actions lack credibility.

52. Frank Segars, the employee terminated from dock, had by all accounts a horrendous employment record. Nonetheless, Segars was hired back within the year. Segars was described in his evaluations as follows: having "glaring deficiencies," "works casually," "no intensity," "not aggressive for loads," "does not follow instructions," "lack of organization" and someone who responded to his supervisors' suggestions with "smirks of disgust." Segars was rehired as assistant dock foreman less than five months after his termination. When asked why he hired back an employee with such a deficient work record, Asarese testified that Segars was frequently around the terminal asking to be rehired, that he had been a loyal employee, and that at times he had "flashes of brilliance."

53. In fact, after Segars was rehired, he continued to have problems and ultimately was terminated in April of 1987 for his refusal to take a drug test. In light of Segars's disciplinary record prior to his termination, as well as plaintiff's experiences at Pittsfield and Chicopee in dock functions, the court finds that the plaintiff was more qualified for

---

8. Blight's performance evaluations while he was an assistant were not admitted into evidence.

rehire into the assistant dock foreman's position than Segars. The only explanation for defendant's decision is plaintiff's gender.

54. The company also internally filled two assistant supervisor linehaul positions after Eldred's termination, rather than rehiring her. The first position was filled in July 1986 by Cynthia Dygon, a general clerk who had only been with the company three months. In defense of selecting Dygon over Eldred, Asarese testified that Dygon was aggressive and had a lot of potential.[9]

55. The second assistant linehaul position was filled by Ronald Feinstein, who was promoted from a driver position. Feinstein had received two disciplinary letters while he was a driver. There was also evidence that this transfer was due to an accommodation for a heart attack. Eldred was qualified to be rehired for this position.[10]

56. Defendant stated that all three individuals had shown themselves to have the qualities the plaintiff lacked and were hired with an eye toward their future promotability. Defendant's proffered reasons are pretexts.

57. Management's decisions regarding which employees to rehire were contaminated with gender bias. Again, the evidence is clear: if plaintiff had been male, she would have been rehired.

E. *OTHER EVIDENCE OF DISCRIMINATION*

58. Consolidated's treatment of Kim Matthews is evidence of the defendant's discriminatory attitude towards women supervisors in its workforce. Matthews had risen through the ranks from clerk to assistant in linehaul, to linehaul supervisor, and then for a period of time to assistant dispatch operations manager.[11] Matthews was the only other female in a supervisory position in Chicopee for any significant portion of the time plaintiff was employed there.

59. In November of 1987, in the latter part of her pregnancy, Matthews requested a temporary switch from the night to the day shift. This change would have allowed her more time off her feet and a better night's rest in preparation for childbirth. The request was denied.

60. Following the birth of her child, Matthews requested a brief extension of her time off, to allow her baby to reach two months old, the youngest acceptable age for a baby sitter. This was also denied on the ground that medical leave could be extended only to persons who were themselves suffering medical problems. She then asked if she might return temporarily to the second shift, which would allow her greater flexibility in attempting to arrange care for her child. This too was denied.

61. According to a memo written by Kiernon, Marshall told Matthews that once her maternity leave had expired no accommodation would be made for her. She would have to return immediately to her previous position on the night shift and, if she could not meet this requirement "she would have to make a decision concerning her employment."

62. In fact, at a meeting set up with Matthews to discuss her request for temporary accommodation, it emerged that Matthews' supervisors had already prepared the form for her resignation. At this meeting, Marshall told Matthews that, "You should stay home with your family because that is

9. Dygon eventually left the defendant's employ. Plaintiff presented testimony that Dygon was forced to resign due to problems between herself and Blight. Defendant's documents, however, reflect that Dygon resigned due to company policy prohibiting married couples from working in direct or indirect supervisory relationships with each other.

10. In December 1986, another assistant dispatcher position opened with the promotion of Blight to dispatcher. Kiernon recommended Ronald Schleicher, and Asarese confirmed the recommendation. Kiernon and Schleicher had worked together for a previous employer. There is no evidence submitted regarding Schleicher's performance. Therefore, the court is unable to compare him to Eldred.

11. In August of 1987, Matthews requested and accepted a demotion from assistant dispatch operations manager to linehaul supervisor. Matthews was having difficulties performing her job due to the unanticipated long hours and her upcoming marriage to Carl Schmidt.

where you belong anyway." Matthews was left with no choice but to resign.

63. Significantly, the form used for Matthews' termination stated "Terminated/would not rehire," the company's indication of termination for cause, i.e. discharge based on some deficiency or misconduct on the part of the employee. Matthews was deemed ineligible for rehire, despite an outstanding employment record, based solely upon her request for temporary accommodation following childbirth. Several years later, when her child was older, she in fact sought employment again with the defendant and contacted Asarese. Despite his opinion that she had been a "fantastic" employee, he declined to offer her a position because of the notation in her record.

64. Jim Smith's back problem, Feinstein's heart problems, and Bubriski's knee problems were all generously accommodated by the defendant. They were each given lighter, more manageable tasks to assist them in staying employed. Matthews asked for less, got nothing, and was forced out. High level management demonstrated a reflexive resistance to the notion of women in supervisory positions. Key management employees were skeptical and unsupportive of the advancement of women in the company while encouraging and assisting in the advancement of men. The unavoidable conclusion is that females were consistently treated differently from male employees by defendant's upper level management.

## IV. CONCLUSIONS OF LAW

### A. DISCRIMINATION BASED ON GENDER

■ Plaintiff has established a *prima facie* case of discrimination with respect to the promotion denial, termination, and failure to rehire, each giving rise to an inference of unlawful discrimination. Contrary to defendant's assertions, failure to apply formally for a job opening when there is no formal application process will not preclude a Title VII plaintiff from establishing a *prima facie* case, as long as the plaintiff made a reasonable attempt to convey her interest in the job to the employer. *E.E.O.C. v. Metal Service Co.,* 892 F.2d 341, 348 (3rd Cir.1990).[12] Although plaintiff did not formally apply, the defendant was well aware of her desire for a promotion. *See Box v. A & P Tea Co.,* 772 F.2d 1372 (7th Cir.1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986). *See Paxton v. Union Nat'l Bank,* 688 F.2d 552, 568 (8th Cir.1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983).

■ Defendant has satisfied the second prong of *McDonnell Douglas* by articulating a legitimate nondiscriminatory reason for each alleged adverse action—the purported superiority of other candidates for promotion, retention and rehire. However, as stated in the facts, the court finds that the stated reasons were pretextual and the real reason for the adverse actions was Eldred's gender. *See Udo,* 54 F.3d at 13.

■ To prove discriminatory animus in a disparate treatment case, where there is no proverbial "smoking gun" evidence, the plaintiff has the burden of showing that she was treated differently from "persons situated similarly 'in all relevant aspects.'" *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 19 (1st Cir.1989), quoting *Smith v. Monsanto Chemical Co.,* 770 F.2d 719, 723 (8th Cir.1985). Eldred was clearly treated differently.

■ Throughout the trial, defendant insisted that plaintiff's lack of aggressiveness stagnated her advancement through the company. However, Schmidt, who "needed to be more aggressive" and Skiba who "lack[ed] ... aggressiveness" were retained in linehaul, and Segars who had "no intensity" and was "not aggressive" was rehired. The fre-

---

12. Moreover, the proof required by *McDonnell Douglas* to establish a *prima facie* case is not inflexible and "is not necessarily applicable in every respect in differing factual situations." *McDonnell Douglas,* 411 U.S. at 802, n. 13, 93 S.Ct. at 1824, n. 13. *See Burdine,* 450 U.S. at 253 n. 6, 101 S.Ct. at 1093 n. 6. The *prima facie* case conceived in *McDonnell Douglas* was "never intended to be rigid, mechanized, or ritualistic." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

quently proffered rationale of essential aggressiveness was a smoke screen.

The double bind the defendant placed Eldred in was exquisitely illustrated by her pursuit of her justified equal pay claim. The filing of the claim—which some might call "aggressive"—generated ill feeling at work that followed plaintiff from Pittsfield to the Chicopee terminal. Eldred was branded as too outspoken, pushy and disloyal because she sought a remedy outside the company. In this regard, the Supreme Court has pointedly noted that, "An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not." *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 251, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (1989).

Women who worked at Consolidated were held to an impossible standard. Whereas a man who was not aggressive might advance easily through Consolidated, a woman like Matthews, who was aggressive or (in Asarese's words) a "superstar," would be forced out for seeking accommodations provided to men as a matter of routine.

In addition, defendant treated plaintiff less favorably than comparably credentialed or even less qualified male employees. Men with inferior performance records were promoted, retained and rehired. Absent the plaintiff's first and only "needs to improve" rating, which defendant concedes was customary, she never again received this rating. By comparison, Blight and Bubriski received numerous "needs to improve" ratings and still advanced within the company. Similarly, Feinstein received reprimands but was selected for an assistant's position in preference to the plaintiff, and Segars was rehired despite an abominable pre-termination record.

The decisions of key management employees to terminate and refuse to promote or rehire plaintiff conformed to a general pattern of discrimination against the few women who worked at Consolidated. *See McDonnell Douglas,* 411 U.S. at 805, 93 S.Ct. at 1825. With an almost exclusively male workforce, and with men recommending who was promotable, who was the "weak link" and who should be rehired, the advancement of women lagged in the company. Of the four women who had been in supervisory positions since the Chicopee facility opened in 1982, *none* remained at the time of trial. Plaintiff was terminated, Dygon and Matthews resigned, and more recently, a woman in a dock position transferred to the Boston facility for reasons that were not explained.

An equitable process of advancing and retaining qualified employees, regardless of their gender, did not exist at Consolidated. Instead, the hiring and termination policies were infected with a bias against women, permitting restrictive and exclusionary practices. As noted above, there was no formal application mechanism. No written guidelines or standards for employment decisions existed. Qualifications for open positions were not communicated to employees; employment decisions were based on a supervisor's discretion. No safeguards were in place to avert discriminatory practices and differential treatment of women. Promotability, termination and rehiring based on such intangibles are "quite incapable of uniform administration and readily susceptible to bias," *Wade v. Mississippi Cooperative Extension Service,* 372 F.Supp. 126, 142 (N.D.Miss.1974), *aff'd in relevant part* 528 F.2d 508 (5th Cir.1976), and subject to "the personal taste, whim or fancy of the evaluator." *Id.*

In sum, the defendant's subjective hiring practices permitted a discriminatory animus against women in supervisory roles to fester. All promotion and lay-off decisions were made without formal procedures and were based entirely on the subjective assessment of male supervisors. As a direct outgrowth of bias in the decision-making process, plaintiff suffered denial of promotion while less qualified males climbed the company ladder, found herself laid off while men with much poorer work histories were retained, and was ignored for rehiring while males who were in no respect her professional equals were brought back. To state it differently, but for her gender, plaintiff would have been promoted, would never have been laid off, and, if laid off, would have been promptly rehired.

## B. *RETALIATION*

 Plaintiff alleges that she was denied a promotion to linehaul supervisor, was discharged and was denied rehire in violation of 42 U.S.C. § 2000e–3(a), in retaliation for filing an equal pay claim against the company. This section states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this sub-chapter.

As set forth above, to establish a *prima facie* case of retaliation under Title VII, the plaintiff must show (1) that she engaged in a protected activity of which the employer was aware, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between her protected activity and the adverse employment action. *Hoeppner v. Crotched Mountain Rehabilitation Ctr.*, 31 F.3d at 14 (1st Cir.1994); *Ramos v. Roche Products*, 936 F.2d at 48; *Petitti*, 909 F.2d at 33 (1st Cir.1990), citing *Watts v. University of Delaware*, 622 F.2d 47 (3rd Cir.1980).

 Plaintiff satisfies the first two elements of the *prima facie* case. Opposing the pay disparity, first with the terminal manager Sage and then under the Equal Pay Act, is a protected activity within the meaning of Title VII. See 29 C.F.R. § 1620.27(a). Moreover, everyone in management who testified admitted they knew about the claim, including Bubriski, Beauchamp, Asarese, Casey, Skiba and Kiernon. As described above, plaintiff did suffer adverse employment actions: she was not promoted, was terminated and was denied rehire.

However, plaintiff is unable to demonstrate the third element, the causal nexus between her protected activity and the adverse employment actions. The First Circuit has explained that "a showing of discharge soon after the employee engages in activity specif-

ically protected by § 704(a) of Title VII, 42 U.S.C. ... is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation." *Oliver*, 846 F.2d at 110; *Ramos*, 936 F.2d at 49.

Here, the causal connection disappears in the lapse in time. The first adverse employment action suffered by plaintiff, the failure to promote her in 1985, occurred almost seven years after she filed her FLSA claim. This length in time precludes a finding of causation. *See Oliver*, 846 F.2d at 110 (two years nine months between filing complaint with EEOC and discharge was too long to prove a causal connection).

Even on the doubtful assumption that the cashing of her settlement check in August 1983 itself constituted opposition to an unfair employment practice, the first alleged adverse employment action did not follow until eighteen months later. Even in this situation, the proximity is too great to infer a causal connection. *See Mesnick v. General Electric Company*, 950 F.2d 816, 828 (1st Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992) (nine months between EEOC complaint and discharge and eighteen months between informal complaint and discharge too long). *See, also e.g. Sardigal v. St. Louis National Stockyards Co.*, 42 FEP Cases 497, 1986 WL 32650 (S.D.Ill.1986) (3 months too long); *Jennings v. Uniroyal Plastics Co.*, No. S86–314, 1989 WL 125601 at, *8 (N.D.Ind. Jan. 25, 1989) (2 years between filing EEOC charge and adverse action not enough to establish causal connection); *Edwards v. Interboro Institute*, 840 F.Supp. 222, 229 (E.D.N.Y.1994) (less than one month between employer learning of EEOC charge and termination does not, in and of itself, establish a *prima facie* case of retaliatory discharge).

Although her filing the claim may have contributed to a less cordial work environment, and added to the discriminatory animus based on her sex, plaintiff cannot make out a legal claim of retaliation absent a clearer showing of a causal nexus.[13] In fact, the

---

13. Plaintiff did receive a promotion after she filed her claim. In addition, her job evaluations were good and she received periodic pay increases.

discriminatory animus in the work place does not appear to have been directed at plaintiff to any substantial degree because she filed the claim; the animus was more deep-rooted and directed against women as supervisors, plain and simple. On these counts, plaintiff is therefore not entitled to damages.

## V. CONCLUSION

For the reasons set forth above, the court will order entry of judgment for the plaintiff on Count II and for defendant on Counts I and III. Written submissions on damages at this point are somewhat scanty. Supplemental submissions—including plaintiff's counsel's submissions with regard to attorneys' fees, if any—will be made by September 15, 1995. The matter will thereafter be set for hearing on damages.