Mary **MUEHLHAUSEN**, Plaintiff,

v.

**BATH IRON WORKS**, Defendant.

**Civ. No. 92–34–P–C.**

United States District Court,
D. Maine.

Jan. 20, 1993.

Robert E. Mittel, Mittel, Asen, Eggert & Hunter, Portland, ME, for plaintiff.

Constance P. O'Neil, Conley, Haley, O'Neil & Kaplan, Bath, ME, for defendant.

## MEMORANDUM OF DECISION

GENE CARTER, Chief Judge.

Plaintiff, Mary Muehlhausen, raises a federal claim of retaliatory discharge under 42 U.S.C. § 2000e–3 and a pendant state claim under 5 M.R.S.A. § 4572, alleging that she was fired in retaliation for having filed two discrimination complaints with the Maine Human Rights Commission ("MHRC").[1]

## FINDINGS OF FACT

Upon review of the credible testimony produced at trial from November 30, 1992—December 2, 1992, the stipulations entered into by the parties, and the exhibits introduced, the Court finds the facts to be as set forth below.

Plaintiff began working for Defendant Bath Iron Works ("BIW") in Bath, Maine as a shipfitter in the summer of 1988. In October, 1988, Plaintiff was transferred to

---

**1.** The analysis of the retaliatory discharge claim under state law is identical to the Title VII analysis contained herein. As this Court explained in *Harris v. International Paper Co.*, 765 F.Supp. 1509, 1511 (D.Me.1991):

The Maine Human Rights Act [5 M.R.S.A. § 4571 *et seq.*] was intended by the Maine legislature to be the state analogue to Title VII, and the judicial construction of federal antidiscrimination law has, as a result, long been adverted to by the Law Court as persuasive authority for the interpretation of the MHRA. *Maine Human Rights Com. v. Auburn,* 408 A.2d 1253, 1261 (Me.1979); *Greene v. Union Mutual Life Insurance Co.,* 623 F.Supp. 295, 298–299 (D.Me.1985).

the BIW plant in Portland, Maine, where she was the only female shipfitter from that time until her termination in February of 1990. On September 18, 1989, Plaintiff filed her first complaint with the Maine Human Rights Commission alleging sexual harassment and discrimination. On December 13, 1989, Plaintiff injured her back at work hauling welding leads in the inner bottom of a ship. The injury kept her out of work for the rest of December, 1989 and into January of 1990. On December 20, 1989, Plaintiff filed her second complaint with the Maine Human Rights Commission alleging retaliation in work assignments as a result of Plaintiff's filing the first human rights complaint.

On January 24, 1990, Michelle Perry, a union shop steward and member of BIW's Human Rights Committee, called Plaintiff at home and asked her to come to BIW's Portland facility (her usual workplace) in order to sign a release form granting Perry access to Plaintiff's personnel file. This request came about because Perry needed such access to assist Plaintiff in pursuit of her discrimination complaints then pending before the MHRC. When Perry initially approached David Wiley, supervisor of Plaintiff's shipfitting department, and asked permission to access Plaintiff's personnel file, Wiley conferred with Edward Galvin, Manager of Personnel Administration, about the request. Galvin, per his usual custom when a human rights complaint is pending, required a written release signed in person by Plaintiff. Wiley thereafter informed Perry he would need written consent from Plaintiff.[2]

Plaintiff arrived at BIW to sign the release form at approximately 10:30 a.m. on January 24, 1990. As Plaintiff walked down the main hallway in the building towards her meeting place with Perry, she encountered Reginald Dubois, acting assistant foreman on that day. Dubois and Plaintiff previously had a difficult working relationship. Dubois was conversing with shipfitter Dan Murphy. Upon noticing that Plaintiff was not wearing safety glasses, Dubois, in his capacity as a supervisor responsible for safety enforcement, told Plaintiff to put on a pair of safety glasses. Plaintiff replied, "I don't need any fucking safety glasses. I am only visiting." Dubois insisted that she needed safety glasses.[3]

Plaintiff continued on and met Perry, who offered Plaintiff her own safety glasses, which Plaintiff immediately put on. However, Dubois remarked that Perry was also required to wear safety glasses. Plaintiff and Perry then left the area and headed towards Perry's locker for another set of safety glasses. Once at the locker, Plaintiff saw that Perry's extra set of glasses were scratched. She took off the safety glasses she was wearing and said, "I don't need to wear these fucking things. Let's get the hell out of here." She and Perry then left the locker area to go upstairs to Wiley's office.

Retracing their steps, they encountered Dubois in the same place as before, still speaking with Murphy. Dubois again noted that Plaintiff was not wearing safety glasses and once more called to her attention, as she passed, that she must wear

---

**2.** Plaintiff attempted to elicit testimony that such a request was unusual and that the request was, in fact, a pretextual reason to get Plaintiff onto BIW premises. The implication of this line of questioning is that some sort of conspiracy existed among various BIW employees to get Plaintiff onto BIW premises, in order to set her up in a situation that would precipitate her discharge. This Court is convinced that there was some hostility at BIW directed towards Plaintiff because of both her gender and strong personality; however, in light of the evidence presented at trial, the Court finds that BIW's request for Plaintiff to sign the release form on BIW premises was in no way pretextual.

**3.** The Court notes that it is possible that Dubois's demand that Plaintiff wear safety glasses was out of line in the circumstances as they existed. While wearing safety glasses is mandatory in all work areas, BIW employees store these glasses in their lockers in the *rear* of the building. Because all employees must enter and exit the building through the doorway at the *front* of the building, employees do not wear their safety apparatus each morning when entering the building or at night when leaving the building. Thus, not wearing safety glasses when entering or leaving the building (either at the beginning, end, or in the middle of a shift if leaving on a "pass-out") is generally acceptable practice at BIW.

safety glasses. She said to Dubois, "Fuck you, asshole" and, in an aside to Ms. Perry, "Why is he on my ass?"

Mark Karass, another shipfitter, was approaching Plaintiff in the corridor at that time and he heard the remark she made to Dubois. Dubois asked Karass within seconds, "Did she say what I thought she said?" Karass responded·thereto, telling him, "Yes, 'fuck you, asshole.'"

Later that same day, Dubois made a complaint regarding plaintiff's behavior to Wiley. Wiley brought the matter to the attention of Peter Moore, BIW Portland's Labor Relations Field Representative at the time, who initiated an investigation that day. Moore conducted preliminary interviews of Dubois, Karass, and Perry. Later that afternoon, on instructions from Galvin, Moore withdrew from any investigation of the matter, because it was thought that his objectivity might be questioned, due to his prior dealings with Plaintiff in regard to her conduct in the workplace.

Moore and Wiley immediately approached Bruce Stimpson, a well respected and competent Production Manager in the Portland facility, and asked him to continue the investigation of Dubois' complaint. Moore explained to Stimpson that he needed to recuse himself from the investigation, given that both he and Wiley had been named in one of Plaintiff's human rights complaints.[4]

Stimpson was then in charge of investigating Dubois' complaint. Stimpson promptly conducted a full investigation, which included interviews with Plaintiff, Perry, Dubois, Murphy and Karass.[5] Per company procedure, Plaintiff was "suspended pending investigation" on January 26, 1990, after being interviewed by Stimpson.

On the basis of his investigation, Stimpson determined that Plaintiff cursed at Dubois, her supervisor, in front of other employees and in response to a safety order from him. In order to help him decide what type of discipline was appropriate in this situation, Stimpson spoke with Labor Department employees from BIW in Bath. He described the incident, without naming Plaintiff, and was told that such behavior constituted insubordination. Stimpson viewed Plaintiff's behavior as a public attack on Dubois' supervisory capacity in front of other employees, and, as such, determined that punishment under Rule 10 for insubordination was most appropriate.[6] Rule 10 provides a nondiscretionary disciplinary penalty of discharge for insubordination. Joint Exhibit No. 1, Attachment "A."

Plaintiff was informed on February 2, 1990, approximately one week after her suspension, that she was being discharged for insubordination under Rule 10.

## ANALYSIS

Title VII was passed in 1964 to remedy workplace discrimination based on race,

---

4. Moore had no further role in the matter other than to sign the employee status change form accomplishing Plaintiff's discharge as a matter of administrative regularity. The form required the signature of an Industrial Relations representative from Portland, of which Moore was the only one in the area.

5. Plaintiff attempted to persuade the Court that Stimpson's investigation was incomplete and his subsequent decision was unfair because he did not investigate: 1) why Plaintiff was required to come to the yard to sign her release form in person; or 2) why Dubois had required that Plaintiff put on her safety glasses, despite his awareness that employees did not wear their safety glasses when entering or leaving the building.

On the first issue, the Court finds that Galvin's testimony on the issue, as explained in the factual findings, was credible. On the second issue,

the Court has already noted that there is reason to doubt that Dubois' order to Plaintiff to wear safety glasses was necessary, under the circumstances, to enforce existing company policy. However, even if such an order was to be found improper, an employer still may find it unacceptable and insubordinate for an employee to respond to such a request with profane language directed at the supervisor, in front of fellow employees.

6. Stimpson also considered disciplining Plaintiff under Rule 40 (failure to carry out orders; first offense warrants a warning) or Rule 42 (failure to wear required safety equipment; first offense warrants a verbal warning). Stimpson decided that Rule 10 was most applicable because Plaintiff's behavior was more serious than not wearing safety equipment or not following an order.

color, religion, sex, or national origin. *See* 42 U.S.C. 2000e *et seq.* In the case at bar, Plaintiff brings a Title VII claim for retaliatory discharge, alleging that she was fired as a direct consequence of having filed with the Maine Human Rights Commission two complaints against BIW alleging sex discrimination and retaliation.

■ Claims for retaliatory discharge under Title VII are based on 42 U.S.C. § 2000e–3(a), which states:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this subchapter.

To demonstrate a *prima facie* claim of such retaliation, the First Circuit Court of Appeals requires that Plaintiff show, by a preponderance of the evidence:

1) protected participation or opposition under Title VII known by the alleged retaliator; [7]

2) an employment action or actions disadvantaging persons engaged in protected activities;

3) a causal connection between the first two elements that is a retaliatory motive playing a part in the adverse employment actions.

*Petitti v. New England Tel. & Tel. Co.,* 909 F.2d 28, 33 (1st Cir.1990); *Hochstadt v.*

*Worcester Foundation for Experimental Biology, Inc.,* 425 F.Supp. 318, 324 (D.Mass.1976), *aff'd,* 545 F.2d 222 (1st Cir. 1976). *See also De Cintio v. Westchester County Medical Center,* 821 F.2d 111, 115 (2d Cir.1987), *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987). The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's discharge. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); [8] *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 107 (1st Cir.1988). The Court notes that this is a burden of production on the employer, not a burden of persuasion; thus, the employer does not have to persuade the Court that is was actually motivated by the reason advanced. *Oliver,* 846 F.2d at 108. The burden of persuasion on the ultimate issue of intent remains with the employee at all times. *Petitti,* 909 F.2d at 31 (quoting *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 899 (1st Cir.1988)). At this point, the burden returns to the employee to demonstrate that the employer's stated reason for the termination was pretextual. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825; *Oliver,* 846 F.2d at 109.

## I. *PRIMA FACIE* CASE

■ In the case at bar, Plaintiff successfully established the *prima facie* case. Using the parties' stipulations and the testimony adduced at trial, the Court finds that the first two elements of the *prima facie* case have been proven.[9] However, wheth-

---

**7.** The success of a retaliation claim does not require that the conduct Plaintiff opposed be, in fact, a Title VII violation. *Manoharan v. Columbia U. Col. of Phys. & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988). Rather, Plaintiff must have had a reasonable belief that a Title VII violation was occurring. *Petitti v. New England Tel. & Tel. Co.,* 909 F.2d 28, 33 (1st Cir.1990) quoting *Jennings v. Tinley Park Community Consol. School Dist.,* 796 F.2d 962, 967 (7th Cir. 1986), *cert. denied,* 481 U.S. 1017, 107 S.Ct. 1895, 95 L.Ed.2d 502 (1987); *Love v. RE/MAX of America, Inc.,* 738 F.2d 383, 385 (10th Cir.1984).

**8.** *McDonnell Douglas* set out the rubric of indirect proof for "disparate treatment" claims under Title VII. This analytical framework has often been applied to factually different claims

which, if proven, may still be characterized as "disparate treatment." Allegations of retaliatory discharge under Title VII have been held to fit within the *McDonnell Douglas* framework. *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 107 (1st Cir.1988). *See Rowlett v. Anheuser-Busch, Inc.,* 832 F.2d 194, 202 (1st Cir.1987).

**9.** The parties stipulated to Joint Exhibit 1 which states:

1. The Plaintiff was discharged from her employment by BIW on February 2, 1990.

4. At the time of her termination on February 2, 1990, the plaintiff had filed two complaints with the Maine Human Rights Commission. Each of those complaints accused the defendant of discrimination. The defendant denied the allegations in each of those

er a causal connection existed between Plaintiff's filing human rights complaints and her subsequent discharge is highly disputed. In a 1988 case, the First Circuit Court of Appeals explained that "a showing of discharge soon after the employee engages in activity specifically protected by section 704(a) of Title VII, 42 U.S.C. 2000e–3(a), is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation." *Oliver*, 846 F.2d at 110; *Rowlett v. Anheuser–Busch, Inc.*, 832 F.2d 194, 202 (1st Cir. 1987); *Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir.1986). Thus, while there is no direct proof that Plaintiff was discharged because she filed two human rights complaints against BIW, the temporal proximity of the filing of the two complaints (September 18 and December 20, 1989), MHRC factfinding hearings regarding each complaint (Fall of 1989 and January 11, 1990) and Plaintiff's suspension and discharge (January 26 and February 2, 1990) is indirect evidence, under *Oliver*, of such a causal connection. Hence, Plaintiff established a *prima facie* case of retaliatory discharge.

## II. DEFENDANT'S BURDEN TO ARTICULATE NON–DISCRIMINATORY REASON FOR DISCHARGE

■ The establishment of a *prima facie* case is not, however, the equivalent of an ultimate finding of discrimination. *Oliver*, 846 F.2d at 108; *Gray v. New England Tel. & Tel. Co.*, 792 F.2d 251, 254 (1st Cir.1986). Rather, it gives rise to an inference of unlawful discrimination, creating a presumption which can be rebutted if the Defendant articulates a legitimate nondiscriminatory reason for its actions. *Furnco Construction Co. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

■ The Court finds that Defendant met its burden in the instant case. BIW elicited

testimony and submitted evidence regarding the rules and regulations governing employees' conduct and discipline at BIW.[10] Given Plaintiff's behavior, which this Court finds was insubordinate, Defendant had valid reason to discharge Plaintiff as proscribed for a first offense under Rule 10 for insubordination. Thus, Defendant stated a legitimate, nondiscriminatory reason for Plaintiff's discharge.

## III. PLAINTIFF'S BURDEN TO SHOW THAT DEFENDANT'S REASON WAS PRETEXTUAL

The remaining question is whether Plaintiff presented evidence sufficient to convince the Court that BIW's stated reason for discharging Plaintiff was merely a pretext for discrimination. Plaintiff could meet this burden "either directly, by persuading the Court that a discriminatory reason more likely motivated the employer or indirectly, by showing that the employer's proffered explanation is unworthy of credence." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (citing *McDonnell Douglas*, 411 U.S. at 804–805, 93 S.Ct. at 1825–26).

Plaintiff produced no direct evidence that Stimpson, or any other agent acting for BIW, intended to discriminate against Plaintiff by discharging her. However, Plaintiff did introduce indirect evidence that, she argues, proves that Defendant's reasons for firing her were pretextual. Plaintiff introduced the employment records of all of the other BIW employees discharged for Rule 10 violations in an attempt to argue that 1) all those who were discharged committed behavior more egregious than Plaintiff's and/or 2) many of those who were discharged for Rule 10 violations were subsequently reinstated. Plaintiff argues that the reinstatement of one half of these employees in these so-called "comparison cases" prove that

complaints. At the time of her termination, the Maine Human Rights Commission had yet to make a determination as to the validity of those complaints....

Stimpson's knowledge, at the time of Plaintiff's discharge, that Plaintiff had filed human rights

complaints with the MHRC was established on direct and cross examination.

**10.** *See* Joint Exh. 1, Attachment A.

BIW's decision to terminate Plaintiff was discriminatory.

Having reviewed those submissions carefully, this Court is not persuaded by Plaintiff's argument. The comparison cases illustrate that some employees discharged under Rule 10 were reinstated, while others were not. The Court is unable to discern any pattern regarding reinstatement that makes suspect the reasons why Plaintiff was discharged without reinstatement. Moreover, no evidence was submitted to establish that Plaintiff sought reinstatement; thus, these comparison cases do not advance Plaintiff's case.[11] Therefore, this Court finds that Plaintiff was unsuccessful in proving that Defendant's proffered reason for the discharge was pretextual.

Having considered the above matters and the record in this cause, it is hereby ORDERED AND ADJUDGED that judgment ENTER against Plaintiff, Mary Muehlhausen, and in favor of the Defendant, Bath Iron Works, on the claim of retaliatory discharge under Title VII.

---

**11.** Plaintiff offered no evidence regarding the reinstatement process specifically—how it operates, whether that avenue was available to Plaintiff, and if not, why not.

The Court notes that, in general, discharged employees were often in violation of more than one rule, whereas employees who were reinstated often had only violated Rule 10 (like Plaintiff in this case). However, *without more*, this Court cannot find that Plaintiff's evidence of comparison cases shows that Defendant's explanation regarding Plaintiff's termination is "unworthy of credence."

Moreover, this Court finds James Mackie, BIW Chief Steward for Portland, credible and, as such, finds that no "deal" was made between Mackie and Moore to dismiss Plaintiff's union grievance. Rather, the Court finds that the union grievance committee voted not to arbitrate Plaintiff's grievance regarding her discharge after requestioning Perry regarding her testimony.