**Richard NELSON and Edward Jessiman, Plaintiffs,**

v.

**UNIVERSITY OF MAINE SYSTEM, Defendant.**

Civil No. 95–0179–B.

United States District Court,
D. Maine.

April 23, 1996.

George C. Schelling, James S. Nixon, Gross, Minsky, Mogul & Singal, Bangor, Maine, for Plaintiffs.

Kate S. Debeoise, Patricia A. Peard, Bernstein, Shur, Sawyer & Nelson, Portland, Maine, for Defendant.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiffs Richard Nelson and Edwin Jessiman, professors at the University of Maine at Machias, sue the University of Maine System under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681–1688. Plaintiffs base their claims on the University's alleged retaliatory employment action. Nelson and Jessiman originally filed a five-count complaint against the University. In a prior order, however, the Court granted Defendant's Motion for Judgment on the Pleadings as to Counts II (Jessiman's First Amendment claim), IV (Nelson's First Amendment claim), and V (Nelson's breach of contract claim). Defendant now moves for summary judgment on the two remaining claims: Jessiman's Title IX claim, Count I, and Nelson's Title IX claim, Count III. For the reasons stated below, the Court grants summary judgment as to Count I, and denies it as to Count III.

### I. Summary Judgment

Summary judgment is appropriate in the absence of a genuine issue of any material fact, when the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c). Thus it is axiomatic that summary judgment must be denied when disputes remain as to consequential facts—facts upon which the outcome may rely. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Menard v. First Sec. Servs. Corp.*, 848 F.2d 281, 285 (1st Cir.1988). Facts may be drawn from "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." *Id.* An issue is genuine, for summary judgment purposes, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. A material fact is one which has "the potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993). The Court views the record in the light most favorable to the nonmoving party. *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995).

### II. Title IX

The Court detailed the factual circumstances underlying this action in its January 29, 1996 order, and refers to those facts as necessary without now recounting them in their entirety. The Court begins with the applicable standards.

Title IX creates an implied private right of action for plaintiffs subject to discrimination in educational institutions which receive federal funds. *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 65, 112 S.Ct. 1028, 1032, 117 L.Ed.2d 208 (affirming *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)); *Cohen v. Brown University*, 991 F.2d 888, 892–93 (1st Cir.1993). The statute protects against disparate treatment in educational programs, as well as sex discrimination and certain retaliatory employment practices in educational institutions. In the context of retaliatory discrimination, at issue in this case, Title IX protects employees who either participate in a Title IX investigation, or who oppose unlawful employment practices prohibited by Title IX. *See Wyatt v. City of Boston*, 35 F.3d 13, 15 (1st Cir.1994) (Title

VII claim). The statute reads, in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . .

20 U.S.C. § 1681(a)[1].

■ Courts generally look to Title VII, 42 U.S.C. §§ 2000e, to supply the legal standards for both Title IX discrimination and retaliation claims. *Brown v. Hot, Sexy and Safer Productions, Inc.,* 68 F.3d 525, 540 (1st Cir.1995) ("Because the relevant caselaw under Title IX is relatively sparse, we apply Title VII caselaw by analogy.") (discrimination claim), *cert. denied,* —— U.S. ——, 116 S.Ct. 1044, 134 L.Ed.2d 191 (1996); *Preston v. Com. of Va. ex rel. New River Community College,* 31 F.3d 203, 206–07 (4th Cir.1994) ("Title VII, and the judicial interpretation of it, provide a persuasive body of standards to which [the court] may look in shaping the contours of a private right of action under Title IX.") (retaliation claim); *Roberts v. Colorado State Bd. of Agric.,* 998 F.2d 824, 832 (10th Cir.) (Title VII provides "the most appropriate analogue when defining Title IX's substantive standards") (disparate impact claim) (citation omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 580, 126 L.Ed.2d 478 (1993); *Moire v. Temple Univ. Sch. of Medicine,* 613 F.Supp. 1360, 1366–67 n. 2 (E.D.Pa. 1985) ("Though the sexual harassment 'doctrine' has generally developed in the context of Title VII, these [Title VII] guidelines seem equally applicable to Title IX.") (discrimination claim), *aff'd,* 800 F.2d 1136 (3d Cir.1986); *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 896–97 (1st Cir.1988) (Court "can draw upon the substantial body of case law under Title VII to assess the plaintiff's [Title IX claim].") (discrimination claim); *see also Davis v. Monroe County Bd. of Educ.,* 74 F.3d 1186, 1190–93 (11th Cir.1996) (discrimination claim); *Murray v. New York University College of Dentistry,* 57 F.3d 243, 248–49, 251 (2nd Cir.1995) (discrimination and retaliation claims). *But see Franklin v. Gwinnett County Pub. Schs.,* 911 F.2d 617, 622 (11th Cir.1990) (rejecting the application of Title VII standards to a Title IX claim concluding "we do not believe applying Title VII to Title IX would result in the kind of orderly analysis so necessary in this confusing area of law.") (disparate treatment claim), *rev'd on other grounds,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992).[2]

While the First Circuit has yet to address a Title IX retaliation claim, the court's treatment of Title IX discrimination claims supports an extension of this analysis to Title IX retaliation claims. For example, in *Lipsett v. University of Puerto Rico,* the First Circuit, applying Title VII principles to a Title IX harassment claim, relied upon: "the legislative history of Title IX, itself, which strongly suggests that Congress meant for similar substantive standards to apply under Title IX as had been developed under Title VII." 864 F.2d at 897; *see Cohen,* 991 F.2d at 902 (noting that the application of Title VII standards in Title IX employment discrimination actions was "perhaps" appropriate).[3] At

---

1. Title IX does provide for certain exemptions, however, none are applicable here. *Id.* at § 1681(a)(1)–(9).

2. Plaintiffs, citing *Franklin v. Gwinnett County Pub. Schs.,* 911 F.2d 617, 622 (11th Cir.1990), *rev'd on other grounds,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), note that "countervailing authority suggest that Title VII principles do not apply to Title IX actions." (Pl. Opp.Sum.J., 14.) They nonetheless "maintain that they can satisfy the standards established by Title VII jurisprudence regarding retaliation." *Id.* While the Supreme Court reserved the question as to whether Title VII standards apply in employment discrimination claims under Title IX, *Franklin v. Gwinnett County Pub. Schs.,* 503 U.S. 60, 65 n. 4, 112 S.Ct. 1028, 1032 n. 4, 117

L.Ed.2d 208 (1992), the First Circuit, as noted above, has looked to Title VII principles in resolving these claims. *Brown,* 68 F.3d at 540; *Lipsett,* 864 F.2d at 896–97. Furthermore the Second Circuit has read the Supreme Court's disposition in *Franklin,* specifically its citation to *Meritor Savings Bank FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), as supporting the extension of Title VII standards to Title IX claims. *Murray,* 57 F.3d at 249.

3. In *Cohen v. Brown University,* the First Circuit rejected the application of Title VII burden shifting standards to the Title IX disparate treatment claim at issue. 991 F.2d at 902. However, the court noted that the burden shifting scheme likely did apply in Title IX employment discrimina-

least two other Circuits have analyzed Title IX retaliation claims under Title VII standards. *Murray*, 57 F.3d at 248–49, 251; *Preston*, 31 F.3d at 206–07. Accordingly this Court is satisfied that Title VII principles apply to the Title IX claims at issue.

## A. Prima Facie Case

As required by the *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden shifting rubric, the Court begins with the requirement for a prima facie case under Title IX.[4] As Defendants only challenge Plaintiffs' prima facie case, the Court need not trace the *McDonnell Douglas* paradigm beyond its first stage. To establish a prima facie case for retaliation under Title IX, a plaintiff must show:

1. he or she engaged in participation or opposition protected by Title [IX];
2. the employer thereafter subjected the plaintiff to an adverse employment action; and
3. there is a causal connection between the protected activity and the adverse employment action.

*See Wyatt*, 35 F.3d at 15 (Title VII claim); *Hoeppner v. Crotched Mountain Rehabilitation Ctr. Inc.*, 31 F.3d 9, 14 (1st Cir.1994)

(same); *Hazel v. U.S. Postmaster General*, 7 F.3d 1, 3 (1st Cir.1993) (Title VII and ADEA claims).[5]

## B. Individual Claims

The University moves for summary judgment on the basis that neither Jessiman nor Nelson have successfully established a prima facie case of retaliatory discrimination under Title IX. As the Plaintiffs present factually distinct claims, the Court address each claim individually, granting summary judgment as to Count I, and denying it as to Count III.

### 1. Count I: Professor Jessiman

As noted above, in federal discrimination cases, the plaintiff bears the burden of proof to establish a prima facie case. Failure to do so entitles the Defendant to summary judgment. The University concedes for the purposes of summary judgment that Jessiman meets the first prong oppositional conduct requirement. The University challenges only the second and third prong requirements of Jessiman's prima facie case.

As to the second prong showing, Professor Jessiman contends that the University engaged in adverse employment action in three distinct ways. First Jessiman contends that the University has subjected him to "highly

---

tion cases, such as the one the Court now addresses.

**4.** Adopting Title VII principles to this Title IX claim, the Court first turns to the burden-shifting rubric employed under Title VII. *See e.g., Lipsett*, 864 F.2d at 899 (employing Title VII burden shifting scheme to Title IX claim). Under Title VII, and other federal discrimination statutes generally, plaintiffs bear the ultimate burden of proof at all times. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1011 (1st Cir.1979). Plaintiffs may satisfy this burden by either direct or circumstantial evidence. *Udo v. Tomes*, 54 F.3d 9, 12 (1st Cir.1995); *LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 842 (1st Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). When factual circumstances dictate the use of the latter, as here, the First Circuit employs the framework set forth in *McDonnell Douglas. See, e.g., Udo*, 54 F.3d at 12; *LeBlanc*, 6 F.3d at 842.

*McDonnell Douglas* sets forth a three-stage process. 411 U.S. at 802–05, 93 S.Ct. at 1824–26; *Goldman v. First Nat'l Bank of Boston*, 985

F.2d 1113, 1117 (1st Cir.1993). At the first stage, the burden of proof rests with the plaintiff, who must set forth a prima facie case of discrimination. *Id.* If successful, then a presumption of discrimination arises in the plaintiff's favor, and the burden of production shifts to the defendant. *McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. at 1824–25; *LeBlanc*, 6 F.3d 836, 842. In response the defendant must proffer a legitimate, nondiscriminatory reason for its alleged discriminatory conduct. *McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. at 1824–25; *Udo*, 54 F.3d at 12. If defendant does so, the burden shifts back to the plaintiff. *LeBlanc*, 6 F.3d at 842; *Goldman*, 985 F.2d at 1117. Then, plaintiff bears the responsibility of refuting the defendant's evidence by showing that defendant's asserted rationale constitutes a pretext for the illegal discrimination. *Lawrence v. Northrop Corp.*, 980 F.2d 66, 69 (1st Cir.1992).

**5.** The First Circuit has noted that a complainant's initial burden of establishing a prima facie case is "not onerous." *Lipsett*, 864 F.2d at 899 (citing *Johnson v. Allyn & Bacon, Inc.*, 731 F.2d 64, 70 (1st Cir.), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984)).

suspect, uninvestigated and unsubstantiated complaints of sexual harassment." (Pl. Opp.Sum.J. at 15.) Second he argues that he "has been defamed as a result of an internal [University] review of the very complaints that he raised against a colleague regarding sexual harassment and abusive treatment of students." (*Id.*) Last, Jessiman claims "he was reprimanded by the President of the University as a result of that review as if he in fact were the offending party." (*Id.*) Jessiman contends that the University's actions have resulted in "professional embarrassment and have caused needless anxiety." (*Id.* at 16.) The Court does not find, however, that these actions, either individually or as a whole, constitute adverse employment action.

■■■■ An adverse employment action need not rise to the level of discharge to be actionable. *Connell v. Bank of Boston,* 924 F.2d 1169, 1179 (1st Cir.), *cert. denied,* 501 U.S. 1218, 111 S.Ct. 2828, 115 L.Ed.2d 997 (1991). It must, however, at a minimum, impair or potentially impair the plaintiff's employment in some cognizable manner. *Nelson v. Upsala College,* 51 F.3d 383, 387 (3rd Cir.1995); *see Petitti v. New England Tel. & Tel. Co.,* 909 F.2d 28, 33 (1st Cir.1990) (where an employment action "disadvantages" persons engaging in protected activity, this element is satisfied); *Ruffino v. State Street Bank and Trust Co.,* 908 F.Supp. 1019, 1044 (D.Mass.1995) ("Generally, a plaintiff must demonstrate that he or she was denied a term, condition or privilege of employment [to establish an adverse employment action].") (citing *Connell,* 924 F.2d at 1179). Demotion, failure to promote, suspension, as well as denial of benefits may also constitute adverse employment action. *Corrigan v. State of R.I., Dept. of Business Regulation,* 820 F.Supp. 647, 655 (D.R.I.1993) ("there is

no doubt that being denied a promotion constitutes an adverse employment action proscribed by the [ADEA]."); *Rivers v. Baltimore Department of Recreation and Parks,* 1990 WL 112429, *10 (D.Md.1990) ("Clearly, a suspension is an adverse employment action [under Title VII]"); *Petitti,* 909 F.2d at 32–33 (finding failure to promote an adverse employment action cognizable under Title VII).

Less clear is whether more subtle employment actions, such as criticisms, reprimands, defamation and other reputational injuries constitute adverse employment action.[6] Divergent authority, nationwide, obscures the parameters of adverse employment action. Nonetheless even under a liberal reading of adverse employment activity, an employee must ultimately show some employment injury. This Court is weary of defining an adverse employment action in a manner which discourages open communication, critical or otherwise, between employers or supervisors and their employees as to the employee's employment performance.

The First Circuit has not specifically addressed the issue of whether reputational injuries resulting from employment activity, alone, may constitute adverse employment action. That court has, however, intimated that "many things, such as constant rudeness, conspicuous discriminatory acts, etc., could also have an adverse effect upon employment." *Welsh v. Derwinski,* 14 F.3d 85, 86 (1st Cir.1994) (per curiam) (addressing ADEA claims); *see Wyatt,* 35 F.3d at 15 (noting other adverse actions covered by § 2000e–3(a) of Title VII, including "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations and toleration of harassment by other employees." (citing 3 Arthur Larson & Lex K. Larson, *Employ-*

---

**6.** The Court notes that prevailing caselaw supports an expansive construction of adverse employment action. Courts have found, for example, that even lateral transfers, without a reduction in pay or benefits can constitute adverse employment action if the employer relocates an employee to an undesirable location in an office, *Trout v. Hidalgo,* 517 F.Supp. 873, 890 n. 67 (D.D.C.1981), *aff'd in part and rev'd in part sub nom., Trout v. Lehman,* 702 F.2d 1094 (D.C.Cir.1983), *vacated on other*

grounds, 465 U.S. 1056, 104 S.Ct. 1404, 79 L.Ed.2d 732 (1984), or to an isolated corner of the workplace, *Harris v. Richards Mfg Co. Inc.,* 511 F.Supp. 1193, 1203 (W.D.Tenn.1981), *aff'd in part and rev'd in part,* 675 F.2d 811 (6th Cir.1982). Additionally the Seventh Circuit, relying on the broad language of Title VII, has held that adverse employment action is not limited to actions relating to strictly monetary concerns. *Collins v. State of Ill.,* 830 F.2d 692, 703 (7th Cir.1987) (citing cases).

*ment Discrimination,* § 87.20, 17–101 to 17–107)).

Despite the broad language used by the First Circuit, this Court is not aware of any court in the First Circuit that has held that mere criticism, or counseling, of an employee constitutes adverse employment action. An actionable retaliation claim requires more. *Fausto v. Welch,* 1994 WL 568846, *7 (D.Mass.1994) ("Disparaging remarks can, under proper circumstances, constitute an adverse employment action [under Title VII]. To do so, however, such disparaging comments must significantly impair the employee's ability to function in his position."); *Welsh v. Derwinski,* 1993 WL 90168, *4 (D.Mass.1993) (reprimand of employee not considered an adverse employment action under ADEA), *aff'd,* 14 F.3d 85 (1st Cir.1994); *see Simmerman v. Hardee's Food Systems, Inc.,* 1996 WL 131948, *14 (E.D.Pa.1996) (neither criticism, however harsh, nor counseling constitutes adverse employment action under the ADA because both have only intangible and indirect effects on employee's status); *Lefevre v. Design Professional Ins. Cos. and Thomas Coppinger,* 1994 WL 544430, *1 (N.D.Cal.1994) (harsh criticism of an employee's work does not constitute adverse employment action under Title VII). Indeed the Court views employee criticism, as with employee praise, as a normal incident of the working relationship between supervisors and those in their charge. Employee evaluation, important to both the employee and the employer, should not be hindered because of the important purposes it serves in improving both employee performance, and employer satisfaction.

Similarly, courts have held that a letter of reprimand placed in an employee's file, alone, does not qualify as adverse employment action. *Coney v. Dept. of Human Resources of State of Ga.,* 787 F.Supp. 1434, 1442 (M.D.Ga. 1992) ("The court finds that a nonthreatening written reprimand, which is later removed from an employee's personnel file, is not an adverse employment action [under Title VII]."); *Rivers,* 1990 WL 112429 at *10 ("A

letter being placed in a personnel file does not, by itself, constitute an adverse employment action ... [because] [s]uch a claim is far too speculative to constitute an adverse employment action [under Title VII]."). *But see Armstrong v. City of Dallas,* 829 F.Supp. 875, 880 (N.D.Tex.1992) (letter of reprimand held to be adverse employment action). However, a letter threatening suspension if the employee's conduct is not corrected, has been held to constitute adverse employment action. *Rivers,* 1990 WL 112429 at 10.

The Court turns to the facts of the instant case, as the First Circuit counsels that "[w]ithin reasonable limits, in order to arrive at a determination [as to an adverse employment action], a case by case review is necessary." *Welsh,* 14 F.3d at 86. In reviewing those facts, the Court finds that no adverse action has been taken on the part of the University against Professor Jessiman as a result of either President Nordstrom's letter of reprimand or the complaints which remain in Jessiman's Equal Employment Opportunity ("EEO") file. Professor Jessiman, by his own admission, continues to enjoy the full benefits of a tenured professor. *See Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1465 n. 6 (9th Cir.1994) (questioning the existence of "adverse" employment action where employee "was not demoted, or put in a worse job, or given any additional responsibilities"), *cert. denied,* —— U.S. ——, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995); *see also Dominic v. Consolidated Edison Co. of New York, Inc.,* 822 F.2d 1249, 1254–55 (2d Cir. 1987) (employee showed adverse employment decision where he was transferred to area with poor working conditions and deluged with work). Jessiman continues to teach all the classes he himself has chosen, and remains free to pursue outside activities as well. Furthermore Professor Jessiman has not provided evidence to show that the University has threatened him with future adverse action. In sum Professor Jessiman has not established any concrete manner in which his employment at the University has been adversely affected.[7]

---

**7.** Plaintiff also cites *Saunders v. Southland Corp.,* 779 F.Supp. 1009 (E.D.Mo.1991), for the proposition that an adverse employee evaluation constitutes an adverse employment action. *Saunders* involved numerous "adverse evaluations," which the court refers to as "unsatisfactory per-

The Court does not consider mere criticism of an employee to constitute adverse employment action. To the contrary, the critical evaluation of employee performance is often a vital function of any supervisor or responsible administrator. An employer or supervisor must be free, to some extent, to point out an employee's failings, as with his or her successes. The Court considers this appropriate practice in the employment context, and generally within an employer's prerogative.

The Court notes that several courts, outside the First Circuit, have construed University action injuring professors' professional reputations as adverse employment actions. *Passer v. American Chem. Soc'y*, 935 F.2d 322, 331 (D.C.Cir.1991) (cancellation of symposium in honor of plaintiff is an adverse employment action because cancellation humiliated him amongst his peers and made procurement of future employment more difficult); *Howze v. Virginia Polytechnic*, 901 F.Supp. 1091, 1098 (W.D.Va.1995) (critical report of professor's conduct could constitute adverse employment action as it could hamper her future endeavors). However, those cases are both distinguishable, and the Court finds neither to be persuasive as to the present matter.

Most analogous to Jessiman's case is *Howze v. Virginia Polytechnic*, 901 F.Supp. 1091, 1098 (W.D.Va.1995). In that case, a professor claimed that her employer, Virginia Polytechnic Institute, retaliated against her because of her claims of sexual discrimination. *Id.* at 1093–94. The professor alleged retaliation on the part of the University in two manners; (1) the denial of the professor's application for tenure, and (2) the issuance of a report critical of the professor. *Id.* In the case of the report issued, it cited the professor as "using unprofessional methods to pursue her concerns about sex discrimination." *Id.* Chief Judge Kiser found that this report could constitute adverse employment

action because "[i]t is conceivable that the [report's] contents could hinder the plaintiff in obtaining research grants, endowed professorships, publications, and other similar accoutrements of a tenured professor." *Id.* at 1098. It appears from the facts of the case that this report may have caused significant damage to the professor's reputation. *See id.* at 1098.

Jessiman's situation differs from that in *Howze* in that he was not criticized by a formal committee, but rather by the University President, and that criticism came by way of a letter to Jessiman, not a committee report. In Jessiman's case neither Nordstrom's reprimand, nor the complaints in Jessiman's EEO file were widely circulated. Furthermore both parties now concede that Nordstrom's letter was ultimately removed from Jessiman's file, and therefore it poses no threat to Jessiman's reputation as would a formal University report.[8]

With regard to the student complaints in Jessiman's EEO file, these letters also do not pose any present threat to Jessiman's position at the University, as no action has been taken as a result of the letters. Sheryl Lambson, the University EEO Officer, claims that the letters may later be "used by her in the event subsequent complaints were made against Dr. Jessiman to support an argument that a pattern of this type of behavior existed as to Dr. Jessiman." (Pl.Mot. Sum.J. at 4.) The Court does not foreclose the possibility that Jessiman may have a claim in the future to the extent he is unjustifiably injured due to these complaints. The Court concludes, however, that at present, the University has not taken any adverse employment action cognizable under Title IX. These reports merely sit in a restricted file at the University, and any resulting injury to Jessiman remains too speculative to be actionable.

---

formance ratings," *id.* at 1015, and at least some of those ratings were part of a formal rating system employed by the company. *Id.* at 1012. The Courts finds these facts distinguishable from those at bar, given that Nordstrom's letter to Jessiman was less formal, and consequently less damaging.

8. *Passer v. American Chem. Soc'y*, 935 F.2d 322 (D.C.Cir.1991) is also easily distinguished given the level of publicity surrounding the cancellation of "a major public symposium in employee's honor," and the more concrete injury suffered by the plaintiff as a result. *Id.* at 331.

As the Court finds that the University did not engage in adverse employment activity against Jessiman, he cannot establish a prima facie case under Title IX and the Court need not review the causation requirement. The Court grants Defendant's Motion for Summary Judgment.

### 2. Count III: Professor Nelson

The University moves for summary judgment as to Count III, on the grounds that Professor Nelson can neither satisfy the first prong oppositional conduct requirement nor the third prong causation requirement of a Title IX prima facie case of retaliation.

#### a. Oppositional Conduct

Defendants claim that Professor Nelson had no reasonable grounds to believe that he opposed conduct in violation of Title IX, and that even if he did believe he was doing so, he never communicated these opinions to anyone involved in the decision to deny him tenure. As to any reports that Nelson did communicate to University officials, such as Dr. Armstrong, then-Vice President of Academic Affairs, the University claims this information was unsubstantiated and mere hearsay, thus undermining any reasonable belief Nelson could legitimately hold as to sexual harassment and discrimination at the University. The University also argues that "Nelson never initiated a sexual harassment complaint on his own behalf, and never initiated a complaint on behalf of any particular individual." (Def.Mot.Sum.J. at 19.) These arguments however misconstrue the requirements under the first prong.

To satisfy the first prong of a prima facie case for retaliation, the conduct opposed need not necessarily violate Title IX; rather, the plaintiff need only have a good faith belief that a Title IX violation was occurring. *Petitti,* 909 F.2d at 33 (1st Cir. 1990) (quoting *Jennings v. Tinley Park Community Consol. School Dist.,* 796 F.2d 962, 967 (7th Cir.1986), *cert. denied,* 481 U.S. 1017, 107 S.Ct. 1895, 95 L.Ed.2d 502 (1987)); *Love v. RE/MAX of America,* 738 F.2d 383, 385 (10th Cir.1984); *Muehlhausen v. Bath*

*Iron Works,* 811 F.Supp. 15, 18 n. 7 (D.Me. 1993). Thus Nelson need not, at this time, necessarily verify his allegations, or show the causal effect of his action. As noted, a complainant's initial burden of establishing a prima facie case is not onerous. *Lipsett,* 864 F.2d at 899 (citing *Johnson,* 731 F.2d at 70).

While Nelson's allegations that Dr. Lehman abused his spouse fall outside the scope of Title his claims concerning the student complaints of sexual harassment relate to prohibited activities under Title IX. *See Hoeppner,* 31 F.3d at 14 (Title VII claim); *Morgan v. Massachusetts General Hosp.,* 901 F.2d 186, 194 (1st Cir.1990) (same). At present, genuine issues of material fact remain as to the extent and veracity of Professor Nelson's opposition to the University's sexual discrimination policies. It is undisputed that at some level Nelson did voice concerns to Dr. Armstrong about the behavior of faculty members pertaining to sexual harassment. The fact that Nelson neither articulated his concerns in writing, nor singled out any particular students victimized by the alleged harassment or discrimination does not dispel the possibility that Nelson held such a good faith belief. Nor do Defendant's challenges to the veracity of Nelson's information, alone, refute the possibility that Nelson could have reasonably believed that University faculty members were in fact violating, or had violated Title IX. Indeed, under the facts presented, a reasonable jury could conclude that Nelson held such beliefs.[9]

Aside from Nelson's conversations with Dr. Armstrong, factual issues also remain as to the other means through which Professor Nelson may have communicated his opposition to University practices prohibited under Title IX. Specifically, the extent of Nelson's role in writing the letters signed by Professor Jessiman remains controverted. While the University notes, and Professor Nelson concedes, that these letters were signed only

---

9. The University, itself, concedes that Nelson presents a "few instances which could arguably qualify as protected activity." (Def.Mot.Sum.J. at 19.) The Court need not go beyond this showing to establish that genuine issues of material fact remain as to this prong of Nelson's prima facie case for retaliation.

by Jessiman, the possibility exists that a jury could find that Nelson did aid in the writing of these letters, and that University officials were aware of both his support for Jessiman's efforts, and Nelson's opposition to the University's sexual discrimination policies in general.

### b. Causation

The Defendant contests Nelson's third prong causation showing as well. Defendant argues that Professor Nelson's alleged oppositional conduct played no part in the decision to deny his application for tenure. Specifically the University argues that no causal link can be established because: (1) the University officials charged with deciding the fate of Nelson's tenure application were unaware of his opposition to the alleged faculty discrimination; and (2) the time lag between Nelson's oppositional actions and the alleged adverse employment action is too attenuated to support a finding of causation. The Court finds neither argument persuasive.

To establish the causation prong, Nelson must show that his protected activity played some role in the adverse action taken against him. *Petitti*, 909 F.2d at 33 (the third element of the prima facie case is made out where there is a showing that "retaliatory motive play[ed] a part in the adverse employment actions."); *Nakai v. Wickes Lumber Co.*, 906 F.Supp. 698, 705 (D.Me. 1995) (same). Thus Nelson must first establish that the relevant University officials were aware of his oppositional conduct, in order to show that this conduct ultimately played a part in their decision to deny his tenure application. While the University claims that the relevant officials were not aware of Nelson's opposition, Professor Nelson provides sufficient evidence to dispute this assertion. Even to the extent that he did not himself bring this conduct to the attention of the relevant University authorities, the possibility exists that these officials could have become aware of this information through alternate channels.

In the absence of direct evidence of causation courts often look to the temporal proximity between the protected activity and the adverse employment action to establish a nexus between the two. *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 110 (1st Cir.1988) ("A showing of [adverse action] soon after the employee engages in [protected activity] is indirect proof of a causal connection between the [adverse action] and the activity because it is strongly suggestive of retaliation."); *Ruffino v. State Street Bank and Trust Co.*, 908 F.Supp. 1019, 1044, 1046 (D.Mass.1995) (causal connection established where adverse actions escalated sharply during and immediately following employee's complaints); *Eldred v. Consolidated Freightways Corp. of Delaware*, 898 F.Supp. 928, 940 (D.Mass.1995) (no causal connection where seven years lapsed between plaintiff's protected activity and adverse employment action). The Court notes, contrary to the Defendant's position, that the decision to deny Nelson's tenure application arose within a sufficient proximity to his complaints to support the possibility that a jury could find a causal connection between these actions. In the instant case, Nelson allegedly raised his concerns regarding the discriminatory practices at various times, including during the Spring and Fall of 1992. He was ultimately denied tenure in February of 1993.

While Nelson's causation argument may be largely inferential, a reasonable jury could nonetheless conclude that the University retaliated against Nelson as a result of his oppositional conduct. Accordingly, this issue, as with the first prong inquiry, is preserved for the fact finder. The Court denies Defendant's Motion for Summary Judgment as to Count III.

### III. Conclusion

For the above state reasons, the Court

(1) GRANTS Defendant's Motion for Summary Judgment as to Count I, and;

(2) DENIES Defendant's Motion for Summary Judgment as to Count III.

*IT IS SO ORDERED.*